# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### AT OWENSBORO

ADRIAN DARNELL BRITTAIN                                                    PLAINTIFF

v.                                          CIVIL ACTION NO. 4:09CV-P123-M

RICK CLEMONS *et al.*                                                     DEFENDANTS

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendants Rick Clemons, Darwin Dennison, Betty Henderson, and Jay Woosley have

moved the Court for summary judgment pursuant to FED. R. CIV. P. 56. Fully briefed,

Defendants' motion is ripe for decision. For the reasons set forth below, the Court will grant the

motion and enter summary judgment in Defendants' favor.

## I. FACTUAL SUMMARY[1]

Plaintiff, Adrian Darnell Brittain, is a convicted federal inmate currently incarcerated at

the Memphis Federal Correctional Institution in Memphis, Tennessee. While a federal pretrial

detainee, Plaintiff was held at the Grayson County Detention Center in Leitchfield, Kentucky,

where the events giving rise to this action took place.

During his time at the Grayson County Detention Center, Plaintiff was housed in cell-unit

314. At any given time, this cell-unit housed approximately a dozen inmates.[2] There was a

television set in the cell-unit that inmates could control and watch. On December 4, 2008,

Plaintiff and another inmate, Johnny Henderson, had a disagreement about the television volume

and control of the remote. The disagreement became physical.

Detention Center personnel Jerry Embry, Truman Newton, Troy Perkins, Luke Millner,

---

[1]Unless otherwise noted, the facts are undisputed.

[2]The maximum capacity of this cell-unit was twelve inmates. At times, slightly more
than twelve inmates were housed in the cell-unit.

and Josh Meredith responded to the altercation.  Deputies Embry and Newton separated Plaintiff and inmate Henderson.  Deputy Perkins escorted Plaintiff to the shower area to clean the blood off of him.  He then took Plaintiff to medical for treatment of some minor abrasions.  Deputy Embry took inmate Henderson to medical where he was cleared.

According to an "Inmate Incident Report," Grayson County Detention Center staff interviewed Plaintiff as well as the other inmates in the cell-unit 314 about the events giving rise to the incident.  All gave a consistent rendition of the events:  Plaintiff and inmate Henderson had a verbal disagreement about the television that escalated to physical violence.  Neither the report nor any other submission by Plaintiff indicates that other inmates were involved in the dispute or were biased against Plaintiff because of it.

After Plaintiff was released from medical, Detention Center personnel returned him to cell-unit 314.  Plaintiff states that he requested to be placed somewhere else because of the altercation and his fears that it might happen again.  In response to Defendants' motion for summary judgment, Plaintiff submitted an affidavit claiming that he feared the other inmates in cell-unit 314 might "retaliate" against him.  However, Plaintiff did not provide any particular reasons to support his fears such as the presence of a specific inmate or explain why he felt he would be a target for future violence if he returned.  He also claims that prison officials were aware that the television was often the source of problems in cell-unit 314.  Again, however, Plaintiff does not provide any evidence to support this assertion.

Instead of moving Plaintiff to another cell, Detention Center personnel moved inmate Henderson to cell-unit 177.  They also placed "alerts . . . in the computer to keep both inmates separate from each other."  Plaintiff remained in cell-unit 314 for over a month without any further documented disturbances or issues.

On January 23, 2009, at approximately 9:40 a.m., Defendant Deputy Betty Henderson was working at a desk located just outside of cell-unit 314. She heard loud voices coming from the cell-unit. When she looked in the cell-unit she observed Plaintiff and inmate Clayton Clouse actively "engaged in mutual combat." Defendant Henderson did not enter the cell to break up the fight. Instead, she called for assistance. It appears this course of action was consistent with the Detention Center's policies. The exact amount of time between Defendant Henderson noticing the fight and placing the call for assistance is unclear. Plaintiff claims that the delay was substantial. Defendant Henderson indicates that she reacted immediately.

Deputies Larry VanMeter, Andy Cain, Bob Thorpe, Marion Blankenship, Jason Woosley, and Chuck Toms responded to Defendant Henderson's call. Once they arrived, Defendant Henderson called for the cell-unit door to be opened. Deputy VanMeter then verbally ordered Plaintiff and inmate Clouse to separate. When they failed to do so, he sprayed them with oleoresin capsicum (pepper) spray to subdue them. After Plaintiff and inmate Clouse separated, the deputies observed "a large open wound" on Plaintiff's wrist. Plaintiff was also noted to be bleeding "profusely" and there was blood on the cell window and floor.

Plaintiff was taken to medical and an ambulance was dispatched to the Detention Center. Once medical staff had the bleeding somewhat under control, Deputy Cain asked Plaintiff what caused the fight. Plaintiff responded "THAT GODDAMN TV." Defendant Woosley inquired whether Plaintiff knew what inmate Clouse had used to cut him. Plaintiff stated that it was a "razor blade." Plaintiff was then transported by ambulance to the hospital where he was treated for his injuries. He received several stitches and some muscle had to be removed from his arm.

After questioning Plaintiff, Defendant Woosley directed Deputy VanMeter to check the inmates and cell-unit 314 for "a shank or razor blade." A homemade weapon with a razor blade

on the end of it was located in the cell. Inmate Clouse denied using the razor blade. Instead, he asserted that Plaintiff had used it and that he had defended himself with a mop handle. The other inmates in the cell stated that inmate Clouse was the one that used the razor blade and that Plaintiff had used the mop handle. For the purposes of summary judgment, Defendants concede that inmate Clouse used a razor blade and that he cut Plaintiff with it.

The Grayson County Detention Center's Policies & Procedures provide that "[a]ll inmates shall be given the opportunity to shave at least twice per week." The Detention Center did not have a written policy in place regarding how the razors were to be distributed to and collected from inmates. Detention Center staff, however, followed a fairly consistent practice when distributing and collecting razors. In January 2009, "the practice was for razors to be passed out to inmates three (3) times a week. The pod deputies would use the head sheet to verify who received a razor and verify the razor had been collected again after sufficient time (approximately one hour) had been allowed for the inmate to use the razor for personal hygiene purposes. The deputies would further attempt to verify that the razor had not been tampered with during the time it had been in the inmate's possession."[3]

Exactly how inmate Clouse obtained the razor is not entirely unclear. Either an inmate failed to turn it back in after razors were distributed for shaving, it was stolen from the Detention Center's hygiene supplies, or a third party smuggled it into the Detention Center. In support of his claims, Plaintiff submitted the headcount sheet from January 23, 2009. It shows that at 1615 hours (4:15 p.m.) razors were handed out in Plaintiff's cell. Plaintiff's altercation with inmate

---

[3]The policy has changed slightly since January 2009. While the process still works essentially the same, "specific deputies are now assigned to pass out the razors and collect them from the inmates. Also, the razors are stored in a locked area and only those deputies that distribute them can open the locked cabinet in which they are located."

Clouse occurred at approximately 9:30 a.m. on January 23rd. Thus, the headcount sheet submitted by Plaintiff does not assist the Court in determining how inmate Clouse obtained the razor.

## II. SUMMARY JUDGMENT STANDARD

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The rule requires the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" FED. R. CIV. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## III. ANALYSIS

Section 1983 provides a federal forum for injured parties to seek a remedy for the

deprivation of their civil liberties.  42 U.S.C. § 1983; *Will v. Mich. Dep't of State Police*, 491

U.S. 58, 66 (1989).  "To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts

that, when construed favorably, establish (1) the deprivation of a right secured by the

Constitution or laws of the United States (2) caused by a person acting under the color of state

law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006).

## A.      Plaintiff's Official-Capacity Claims

Plaintiff is suing Defendants in both their individual and official capacities.

"Official-capacity suits . . . 'generally represent [] another way of pleading an action against an

entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (quoting

*Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).  Therefore, Plaintiff's

official-capacity claims against Defendants are treated the same as if brought directly against

Grayson County.  *See Lambert v. Hartman*, 517 F.3d 433, 440 (6th Cir. 2008).

Under *Monell*, the Supreme Court held that a civil rights plaintiff suing a municipal

entity under 42 U.S.C. § 1983 must show that his injury was caused by a municipal policy or

custom.  A county is considered a municipal entity for the purposes of § 1983.  *L.A. Cnty. v.*

*Humphries*,

-- U.S.--, 131 S. Ct. 447 (2010).   A municipality may only be held liable for the actions of its

employees and agents where its policies or customs have served to cause the constitutional

deprivation.  *Deaton v. Montgomery Cnty., Ohio*, 989 F.2d 885, 889-90 (6th Cir. 1993).  The

policy or custom "must be 'the moving force of the constitutional violation' in order to establish

the liability of a government body under § 1983." *Polk Cnty. v. Dodson*, 454 U.S. 312, 326

(1981) (quoting *Monell*, 436 U.S. at 694).

Plaintiff affirmatively states in his sur-reply that he "does not allege that Grayson County

Detention Center Policy is unconstitutional; the allegations are that Grayson County Detention Center failed to follow their own Policy & Procedure . . . violat[ing] Plaintiff's clearly established constitutional rights to a reasonable safe environment and protection from a known danger." Because Plaintiff agrees that he is not alleging the existence of any unconstitutional policies or customs, Defendants are entitled to summary judgment on his official-capacity claims.

**B.    Individual-capacity claim against Sheriff Rick Clemons**

Plaintiff alleges that Defendant Clemons "failed to train and properly supervise his staff which includes Deputy Jailers who are codefendants. His failure to train and supervise his staff caused Plaintiff to be injured after Defendant Clemons's staff failed to adhere to policy as trained, or failed to be properly trained at all." It is undisputed that Defendant Clemons is the Sheriff of Grayson County.

The duties of sheriffs in the Commonwealth of Kentucky are set forth in KY. REV. STAT. §§ 70.010 -70.273. Overseeing the jails and training deputy jailers are not among those duties. Rather, in Kentucky, jailers are elected to oversee the jails.[4] *See* KY. REV. STAT. § 71.020 ("Each jailer shall have the custody, rule and charge of the jail in his county and of all persons in the jail and shall keep the same himself or by his deputy or deputies."). Defendant Clemons was not legally charged with ensuring Plaintiff's safety while he was housed at the Grayson County Detention Center. And, Plaintiff has not come forward with any evidence to suggest that Defendant Clemons was personally involved in the events giving rise to this action. Accordingly, Defendant Clemons is entitled to summary judgment.

---

[4]The sheriff only becomes responsible for overseeing the jails if for some reason the jailer is committed to jail himself or if the office of the jailer becomes vacant. *See* KY. REV. STAT. § 71.090.

## C.     Investigation-related claims

Plaintiff complains that Defendants did not properly investigate inmate Clouse's assault on him in accordance with the Grayson County Detention Center's Policies & Procedures and did not allow him to press charges against Defendant Clouse.

Plaintiff relies on a portion of the Policies & Procedures that states:

Whenever possible, instances of use of force will be supervised by staff with the rank of Lieutenant or above.

When possible, supervisory staff will have a planned strategy in place for controlling the incident.  This will involve explaining to each Deputy what responsibilities they have in relation to the incident.

When possible, medical staff should be alerted in advance of the use of force.  Their responsibilities shall include but not be limited to:

1)     A physical examination of the inmate(s) involved in the incident. This examination shall be undertaken as soon as the supervisory Deputy determines said examination can be conducted in a safe and secure manner.

2)     In the event an inmate(s) refuse to undergo an examination or treatment of injuries, medical staff will provide a visual assessment of the inmate's condition and properly document all observations.

3)     All documentation by the medical staff shall be included in the inmate's medical file, even if no apparent signs of physical injury are present.

4)     Documentation shall include written accounts of the post-incident examination and photographs taken of the injuries.  Even if no injuries are apparent, photographs should be taken of extremities, face, and head of the inmate(s) involved in the incident.

This section applies to force by Detention Center staff, not other inmates.  Thus, the staff did not violate any policies by failing to "photograph the scene of the incident . . . [Plaintiff's] injured wrist . . . [or] the weapon fashioned from a shaving razor . . . ."

Even if Defendants had violated the policy, however, it does not mean Plaintiff would have a viable constitutional claim against them.  A prison official's failure to follow internal

8

rules and regulations does not alone state a constitutional violation. "The state has no 'federal due process obligation to follow all of its procedures; such a system would result in the constitutionalizing of every state rule, and would not be administrable.'" *Smith v. Ottinger*, Nos. 86-1733, 86-1744, 2000 U.S. App. LEXIS 23495, at *6 (6th Cir. Sept. 14, 2000) (quoting *Levine v. Torvik*, 986 F.2d 1506, 1515 (6th Cir. 1993)). Because Plaintiff did not have a constitutional right to insist upon Defendants following all of the Detention Center's Policies & Procedures, Defendants are entitled to summary judgment on this claim.

Likewise, "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973). Simply put, Plaintiff cannot force Defendants to criminally prosecute inmate Clouse because private citizens, whether or not they are incarcerated, have no right to compel the state to criminally prosecute another person. *Id.* Defendants are entitled to summary judgment on this claim.

## D.      Failure to protect claim

Plaintiff's remaining claim is that Defendants Dennison, Woosley, and Henderson failed to protect him from harm by: 1) returning him to cell-unit 314 after his altercation with inmate Henderson in December 2008; 2) allowing inmate Clouse to obtain a razor blade; and 3) failing to timely intervene before inmate Clouse injured him.[5]

"Prisons are necessarily dangerous places; they house society's most antisocial and violent people in close proximity with one another." *Farmer v. Brennan*, 511 U.S. 825, 858 (1994) (Thomas, J. concurring). As a result, some level of prison violence is unavoidable no

---

[5]The Eighth Amendment imposes a duty upon prison officials to protect prisoners in custody from violence at the hands of other prisoners. *Id.* Pretrial detainees enjoy an analogous right under the Due Process Clause of the Fourteenth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979).

matter what precautions are taken and officers cannot be expected to prevent every assault before it occurs or to stop every assault in progress before injuries are inflicted. "[A] prison official may be held liable . . . for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847.

First, "to establish a constitutional violation based on failure to protect, a prison inmate [] must show that the failure to protect from risk of harm is objectively 'sufficiently serious.'" *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (quoting *Brennan*, 511 U.S. at 833). "The inmate must show that 'he is incarcerated under conditions posing a substantial risk of serious harm.'" *Id.*

Second, "a plaintiff also must show that prison officials acted with [subjective] 'deliberate indifference' to inmate health or safety." *Id.* (quoting *Brennan,* 511 U.S. at 834). A plaintiff must show "more than ordinary lack of due care for the prisoner's interests or safety." *Brennan*, 511 U.S. at 835. The subjective requirement is met only where a plaintiff demonstrates that prison officials acted with "deliberate indifference" to a substantial risk of harm. An official is deliberately indifferent where "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id.* at 837. "An official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Id.* at 838. In analyzing the subjective component, a district court should consider each defendant's state of mind individually, not collectively. *Bishop*, 636 F.3d at 767.

Additionally, "prison officials who actually knew of a substantial risk to inmate health and safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Brennan*, 511 U.S. at 844. "Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the *Cruel and Unusual Punishment Clause*." *Id.* at 845 (emphasis in original).

### 1.     Returning plaintiff to cell-unit 314

Plaintiff has presented evidence that both Defendants Dennison and Woosley were responsible for the decision to leave Plaintiff in cell-unit 314.[6]

The inmate with whom Plaintiff fought was removed from cell-unit 314 and a notation was placed in the computer system to keep the two inmates away from one another. While the television remained in the cell, Plaintiff has failed to present evidence that Defendants should have inferred that placing him back in the same cell after the other inmate had been removed would endanger him. Plaintiff has not presented proof that the prison officials knew that any of the other inmates in the cell were involved in the fight or encouraged it; that they were biased against Plaintiff; that Plaintiff was a particularly vulnerable inmate; or that some other set of circumstances was present that would indicate that Plaintiff was more likely to be harmed if placed back in that cell-unit as opposed to another unit. While Plaintiff has alleged that there was a history of violent incidents in cell-unit 314 involving the televison, he has failed to cite to any part of the record to support this assertion. Thus, Plaintiff has not met his burden of showing

---

[6]Defendant Dennison stated in his interrogatory answers that he was in control of inmate placement and made the decision to place Plaintiff back in cell-unit 314 after the incident of December 4, 2008, because the other inmate had been removed. Defendant Woosley stated in his interrogatory answers that he had the authority to "override a decision regarding inmate placement," but did not do so in Plaintiff's case. There is no evidence that Defendant Henderson played any role in the cell-placement decision. Accordingly, this claim does not pertain to her.

that placing him back in cell-unit 314 after the December 4, 2008, incident exposed him to an objectively unreasonable risk of future harm.

Likewise, Plaintiff has not shown that either Defendant Dennison or Defendant Woosley acted with a subjective intent to cause Plaintiff harm. While Plaintiff did not get placed in a new cell, Detention Center staff took steps to remove inmate Henderson from cell-unit 314 before placing Plaintiff back in it. Additionally, Detention Center staff placed alerts in the computer system to make sure that Plaintiff and inmate Henderson were never placed together again. Moreover, it appears from the record that approximately fifty days passed without incident before Plaintiff was involved in a second altercation with a different prisoner. Such actions belie a desire on the part of Defendants to cause further harm to befall Plaintiff, particularly where he has failed to offer any explanation other than the presence of the television from which Defendants should have inferred that another incident was likely to occur. As such, Plaintiff has also failed to meet his burden of proving that Defendants Dennison and Woosley acted with a subjective intent to harm Plaintiff.

Defendants Dennison and Woosley are entitled to summary judgment on this portion of Plaintiff's failure-to-protect claim.

### 2. Allowing inmate Clouse to obtain a razor

Plaintiff does not present any evidence that establishes how inmate Clouse obtained the razor. He infers that someone must have violated the policy when passing out or collecting razor blades. While Plaintiff alleges that one of the three Defendants improperly passed out or collected razors, there is no proof that links any of the three Defendants with such conduct.

A complaint filed under § 1983 must also show a causal connection between the named defendants and the alleged constitutional deprivation. A § 1983 complaint must allege that

specific conduct by the defendants was the proximate cause of the constitutional injury.

"Congress did not intend § 1983 liability to attach where causation is absent." *Deaton.*, 989 F.2d

at 889. To establish causation, a plaintiff must adduce "an affirmative link . . . [a] moving force

that animated the behavior . . . that resulted in the constitutional violations alleged." *Id.* When

the theory of causation is a matter of pure speculation and is nothing more than a hypothetical

argument, the pleadings are insufficient to sustain a compensable § 1983 claim. *Horn by Parks*

*v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 659 (6th Cir. 1994).

There is simply nothing in the record that establishes an affirmative link between the

three Defendants and inmate Clouse having obtained the razor. As such, Plaintiff has failed to

establish the causation necessary to maintain a § 1983 claim against them in their individual

capacities.

Further, Plaintiff can not impute liability on the Defendants based on their supervisory

roles in the Detention Center. In suits brought under 42 U.S.C. § 1983, "[g]overnment officials

may not be held liable for the unconstitutional conduct of their subordinates under a theory of

respondeat superior." *Ashcroft v. Iqbal*, – U.S. –,129 S. Ct. 1937, 1948 (2009) (citing *Monell*,

436 U.S. at 691. In other words, "a public officer or agent is not responsible for the

misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty,

of the sub-agents or servants or other persons properly employed by or under him, in the

discharge of his official duties." *Id.* (quoting *Robertson v. Sichel*, 127 U.S. 507 (1888)).

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each

Government-official defendant, through the official's own individual actions, has violated the

Constitution." *Id.*

Even if Plaintiff had shown that one of the Defendants violated the Detention Center's

practices/policies for razor distribution and collection that resulted in inmate Clouse obtaining the razor, it would not automatically subject that Defendant to liability for failure to protect. A violation of a policy, standing alone, does not satisfy the subjective intent to cause harm prong. "Imperfect enforcement of the policy shows, at most, negligence by the defendants, rather than deliberate indifference." *Taylor v. Boot*, 58 F. App'x 125, 127 (6th Cir. 2003); *Davis v. Lackawanna County Prison Bd.*, No. 4:CV-07-1682, 2010 U.S. Dist. LEXIS 31836 (M.D. Pa. Mar. 31, 2010) (holding that a prisoner's claim that another prisoner was allowed to come into contact with a razor and assault the plaintiff at most showed negligence rather than deliberate indifference).

Defendants are entitled to summary judgment on this claim.

### 3. Failing to timely respond

This claim only pertains to Defendant Henderson as it is undisputed that she was the first official to become aware of the altercation between Plaintiff and inmate Clouse. It is likewise undisputed that she did not enter cell-unit 314 upon first observing the fight. Instead, she called for further assistance from other jail guards. The precise amount of time that elapsed between Defendant Henderson first noticing the altercation and radioing for assistance is not entirely clear. It is clear, however, that Plaintiff was still actively participating in the altercation when the back-up assistance arrived because the guards had to use pepper spray to separate the two inmates.

Defendant Henderson states that she did not enter cell-unit 314 immediately upon becoming aware of the altercation because she was alone at the time and "the Grayson County Detention Center has a policy which prohibits deputies from entering a cell under [such] circumstances without another deputy being present." She states that she timely radioed for

backup assistance.  Plaintiff maintains that she delayed calling until he screamed at her to get him some help.

      If two inmates are armed with weapons and engaged in combat with one another, there is an objective risk that serious harm will come to one or both of them if prison officials do not intervene.  Accordingly, for the purposes of summary judgment, Plaintiff satisfies the first prong necessary to prevail on a failure-to-protect claim.

      The subjective prong is more problematic for Plaintiff.  The only "evidence" Plaintiff offers to support this element is his uncorroborated statement that Defendant Henderson delayed before assisting Plaintiff.  Plaintiff has no actual proof of the amount of time that elapsed between Defendant Henderson first observing the altercation and the time she called for assistance.  Plaintiff was actively engaged in combat with inmate Clouse at the time.  What may have been only a few seconds may seemed like a much longer period of time to Plaintiff.  Additionally, Plaintiff's version of events does not take into account the fact that a period of a couple of minutes no doubt elapsed between the time Defendant Henderson saw the altercation, made the call for help, and the help actually arriving.  This does not mean that Defendant Henderson delayed in taking action.  It means only the results of her actions were not instantaneous.

      Additionally, "prison guards have no constitutional duty to intervene in an armed assault by an inmate when the intervention would place the guard in danger of physical harm."  *Patmon v. Parker*, 3 F. App'x 337, 338 (6th Cir. 2001).  Subjective intent cannot be inferred from the fact that Defendant Henderson, a female officer, did not enter a cell containing thirteen male inmates to break up a violent physical alternation between two armed inmates.  The only thing that can be inferred from such a decision is that Defendant Henderson placed her personal safety

and that of the prison as a whole ahead of Plaintiff's safety. The fact that she made such a choice, however, does not mean that she wanted harm to come to Plaintiff. *See Longoria v. Texas*, 473 F.3d 586, 594 (5th Cir. 2006) ("[N]o rule of constitutional law requires unarmed officials to endanger their own safety in order to protect a prison inmate threatened with physical violence."); *Winfield v. Bass*, 106 F.3d 525, 532 (4th Cir. 1997) ("Winfield is unable to point to any decisions establishing that an unarmed prison official exhibits deliberate indifference to an inmate's reasonable need for safety, or acts unreasonably, by failing to intervene immediately in an attack by one prisoner armed with a dangerous weapon on another.").

Viewing the evidence as a whole and in a light most favorable to Plaintiff, even if one assumes that Defendant Henderson did delay for a few minutes before radioing for assistance, a subjective intent to harm cannot be inferred from that fact alone. Defendant Henderson radioed for assistance while the two men were still engaged in active, physical combat. Even when assistance did arrive, the fight was still so intense that the officers had to use pepper spray to break it up. Had Defendant Henderson truly been acting out of a subjective desire to cause harm, she would have delayed her call for assistance until one or both of the men appeared too injured to continue.

Plaintiff has not come forward with evidence to support the subjective prong of a failure-to-protect claim against Defendant Henderson. Accordingly, she is entitled to summary judgment on this claim.

## IV. ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendants' motion for summary judgment (DN 45) is **GRANTED**. By separate Order, the Court will direct the Clerk of Court to enter summary judgment in Defendants' favor.

Date:

cc:     Plaintiff, *pro se*
        Counsel of record
4414.008